## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | |
|---|---|
| **RACHEL MEULLION, ET AL** | **CIVIL DOCKET NO. 6:23-CV-01312** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **BOARD OF SUPERVISORS FOR THE UNIVERSITY OF LOUISIANA SYSTEM, ET AL** | **MAGISTRATE JUDGE CAROL B. WHITEHURST** |

### MEMORANDUM RULING

Before the Court is a MOTION FOR SUMMARY JUDGMENT (the "Motion") filed by Defendant, the Board of Supervisors for the University of Louisiana System (hereinafter, "Defendant"). [Doc. 70]. Plaintiffs Rachel Meullion and Kirk Underwood (hereinafter, "Plaintiffs"), a married couple, filed an opposition to Defendant's Motion [Doc. 73] and Defendant filed a reply [Doc. 74]. Oral argument was conducted on Defendant's Motion on February 21, 2025. Defendant filed a supplemental memorandum on February 28, 2025 [Doc. 89] and Plaintiffs filed an opposition on March 13, 2025 [Doc. 90]. For the following reasons, Defendant's Motion is GRANTED in part and DENIED in part.

### FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit arises out of the termination of two employees from the University of Louisiana at Lafayette ("UL") stemming from UL's mandatory COVID-19 (hereinafter "COVID") testing and vaccination policy. Both Meullion and Underwood were longtime UL employees. Meullion was hired on or about May 4, 2004, by the Department of Special Services as a project assistant. [Doc. 73-2, p. 3]. Meullion

provided clerical support to the assistant director of the university's Ronald E. McNair Program, which included maintaining physical files, managing student workers in her office, providing services to McNair scholars, and making campus deliveries. [Doc. 70-3, pp. 10-12]. Underwood was hired in November 2001 to provide technological support and data analytics to the Department of Special Services. [Doc. 73-2, pp. 15, 180]. Underwood also maintained the on-campus student computer lab. [Doc. 70-2, p. 13]. While Underwood's job allowed him to remotely access computers, he would occasionally have to be on campus to provide computer-related assistance. [Doc. 70-2, pp. 12-13, 41].

Plaintiffs allege that they are members of the Natural Law faith, a religious belief which is "based in the Bible[,]" where followers have a "spiritual connection with [God] through prayer." [Doc. 73-2, p. 307]. As adherents of the Natural Law faith, Plaintiffs "are obligated to follow God's guidance and if they disobey God's guidance and take on another's guidance, they will violate God's commandment of '[t]hou shalt have no other gods before me.'" *Id.* Plaintiffs go on to state that "[t]his commandment is the core of the Plaintiffs' faith in Natural Law." *Id.* at p. 308. Defendant is a Louisiana state agency that operates, controls, and administers UL. [Doc. 13, p. 3].[1]

---

[1]     The University of Louisiana System encompasses nine higher education institutions: Grambling State University, Louisiana Tech University, McNeese State University, Nicholls State University, Northwestern State University, Southeastern Louisiana University, University of Louisiana at Lafayette, University of Louisiana at Monroe, and University of New Orleans. The Defendant Board of Supervisors is the management board for all nine public universities.

A brief timeline of the events leading up to this dispute are as follows. At the outset of the COVID pandemic in March 2020, Plaintiffs began working remotely. [Doc. 73-2, pp. 3, 180]. After working entirely remote for many months, Plaintiffs were directed to return to the office part-time on a staggered schedule, with Meullion returning in August 2020, and Underwood on July 1, 2021. *Id.* at pp. 3-4, 187. Meullion returned to full-time work in the office on May 20, 2021, and Underwood did the same on August 16, 2021. *Id.* at pp. 4, 180.

Upon the return of all employees to in-office work, UL implemented a mandatory weekly COVID testing policy for all employees (hereinafter, the "COVID policy"). *Id.* at pp. 79-80. The requirements of the COVID policy were emailed to faculty and staff on September 28, 2021. *Id.* The policy required that employees submit to weekly COVID testing unless they provided proof of vaccination or had tested positive for COVID within the past ninety days. *Id.* at pp. 79-80, 301. Employees who had been vaccinated for COVID were exempt from weekly testing and instead subjected only to "random" testing. Both the policy and the record are unclear as to whether random testing actually occurred.

A little over a week after UL implemented its testing and vaccination policy, on October 7, 2021, Plaintiffs emailed UL's Human Resources Department asserting that their religious beliefs prevented compliance with the COVID policy. *Id.* at pp. 84, 191. The director of the Human Resources Department responded to Plaintiffs, explaining that there were no exemptions to weekly testing. *Id.* at pp. 86, 162. Thereafter several weeks of email communication took place between the Plaintiffs

and employees of the Defendant.  In some of these emails, the Plaintiffs requested accommodation forms, *see n. 17 infra*; in others, the Plaintiffs appeared to be formally putting Defendant on notice that they believed their rights had been violated by Defendant's COVID policy (hereinafter, "Notice of Rights Violations" emails).  *Id*. at pp. 91, 129, 196, 228.  And throughout this entire period, Plaintiffs were receiving weekly testing notification emails and non-compliance notices.  *Id*. at pp. 88-89, 95-96, 105-06, 193-94, 200-01, 211-13 (weekly notification emails); *Id*. at pp. 98-112, 147, 169, 203 (non-compliance notices).  Ultimately, after weeks of what the Plaintiffs allege was retaliatory refusal to provide the proper accommodation request forms, Plaintiffs completed and submitted the accommodation forms on November 19, 2021, *Id*. at pp. 158-60, 257-59, which were ultimately denied by Defendant because the requests did not "identify the conflict that exists between their religion, belief, practice, and/or observance of this work requirement."  *Id*. at pp. 166-67, 264-65.  These forms indicate that the Defendant did not consider alternative accommodations before denying Plaintiffs' accommodation requests.  *Id*. at pp. 166, 264.

Plaintiffs were placed on unpaid leave on November 18, 2021, and were ultimately terminated on November 22, 2021.  *Id*. at pp. 150, 172-73, 249, 270.  Plaintiffs subsequently filed a charge with the EEOC and the Louisiana Commission on Human Rights on March 24, 2022.  *Id*. at pp. 175, 272.  On June 28, 2023, Plaintiffs received a NOTICE OF RIGHT TO SUE LETTER from the EEOC.  *Id*. at pp. 176, 273.

Plaintiffs filed suit in this Court on September 21, 2023,[2] seeking recovery under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, codified at 42 U.S.C. § 2000e *et seq.*, ("Title VII") on claims of: (i) disparate impact, (ii) failure to accommodate, (iii) retaliation,[3] (iv) disparate treatment, and (v) harassment/hostile work environment. [Doc. 1]; [Doc. 50].

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In applying this standard, the Court should construe "all facts and inferences in favor of the nonmoving party." *Deshotel v. Wal-Mart Louisiana, L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). As such, the party moving for summary judgment bears the burden of demonstrating that there are no genuine disputes of material fact as to issues critical to trial that would result in the movant's entitlement to judgment in

---

[2]    Plaintiffs filed suit in this Court pursuant to 28 U.S.C. § 1331. [Doc. 1].

[3]    Plaintiffs' retaliation claims are two-fold. First, Plaintiffs allege retaliation in the form of termination. [Doc. 50]. Second, Plaintiffs claim non-overt retaliation that includes "conduct that impedes an employee's ability to secure or advance their rights," including Defendant's failure to timely provide them with the proper religious accommodation forms. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54, 126 S. Ct. 2405, 2407, 165 L.Ed.2d 345 (2006).

its favor, including identifying the relevant portions of pleadings and discovery. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies its burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id, citing Celotex*, 477 U.S. at 323. In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine dispute for trial – and thus a grant of summary judgment is warranted – when the record as a whole "could not lead a rational trier of fact to find for the non-moving party[.]" *Id.*

## LAW AND ANALYSIS

The Court notes at the outset of this case that the Plaintiffs in this matter appear pro se. It is well-settled that the pleadings and filings of pro se litigants are awarded a certain level of leniency by this Court to ensure that they are afforded due process. *Cowart v. Courtesy of Ruston LLC*, 2024 WL 3461068, at *4 (W.D. La. July 18, 2024) ("The pleadings of pro se litigants are held to a more lenient standard than those of attorneys and are construed liberally to prevent a loss of rights that might result from inartful expression."). "However, pro se plaintiffs are required to plead factual allegations that rise above a speculative level, and courts should not create causes of action where none exist." *Id, citing Chhim v. University of Texas at Austin,*

836 F.3d 467, 469 (5th Cir. 2016). And pro se plaintiffs must still submit competent evidence to avoid summary judgment. *Davis v. Fernandez*, 798 F.3d 290, 293 (5th Cir. 2015), *citing Gordon v. Watson*, 622 F.2d 120, 123 (5th Cir.1980) (per curiam).

## I.    Title VII Disparate Impact

### A.    *Prima Facie Case*

Title VII's disparate-impact provisions target unintentional discrimination, "to rid the workplace of practices that are fair in form, but discriminatory in operation." *Ricci v. DeStefano*, 557 U.S. 557, 583, 129 S. Ct. 2658, 2676, 174 L.Ed.2d 490 (2009), *quoting Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971) (internal quotations omitted); *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006) (disparate impact discrimination addresses employment practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group). A plaintiff establishes a prima facie disparate-impact violation by demonstrating: (i) that an employer has a facially neutral policy; (ii) that, in fact, has a disproportionately adverse effect on a protected class of individuals. *Pacheco*, 448 F.3d at 791, *citing Herbert v. Monsanto*, 682 F.2d 1111, 1116 (5th Cir.2006); *see also Ricci*, 129 S. Ct. at 2673, *quoting* 42 U.S.C. § 2000e–2(k)(1)(A)(i).

With disparate-impact claims, proof of discriminatory motive is not required. *Pacheco*, 448 F.3d at 787, *citing Herbert*, 682 F.2d at 1116. And according to well-established jurisprudence, the evidence presented "will focus on the degree of *statistical disparity* between protected and non-protected workers in regard to

employment or promotion[.]" *Ashford v. Harvey*, 2006 WL 461966, at *4 (E.D. La. Feb. 23, 2006), *citing Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 813 (5th Cir. 1996) and *Munoz v. Orr*, 200 F.3d 291, 300 (5th Cir. 2000) (emphasis added).

### B.    Arguments Before the Court

Defendant argues that Plaintiffs fail to present any statistical evidence sufficient to support a disparate impact claim. [Doc. 70-1, p. 9]; [Doc. 74, p. 7]. In response, Plaintiffs contend that while the COVID policy is facially neutral, it has a disparate impact upon all members of the Natural Law faith because it burdens "one hundred percent" of the protected class. [Doc. 73-1, p. 22].

### C.    Prima Facie Analysis

To meet their burden of establishing a prima facie case, Plaintiffs must demonstrate that the COVID policy resulted in either: (i) a disparity between the Natural Law faith and other religions, or (ii) a disparity between religious followers and secular individuals. *See Barrow v. Greenville Indep. Sch. Dist.,* 2002 WL 628665, at *8 (N.D. Tex. Apr. 18, 2002). Plaintiffs fail to meet this standard on both fronts. First, Plaintiffs fail to present evidence of any other members of the Natural Law faith that were impacted by the COVID policy. The only members of the Natural Law faith identified in the record are the two Plaintiffs themselves. Moreover, Plaintiffs fail to provide any evidence that all members of the Natural Law faith share Plaintiffs' beliefs. Rather, the record shows that religious convictions for members of the Natural Law faith are formed upon individual reflection and prayer to God. [Doc. 73-2, pp. 307-08]. Therefore, it is unclear whether any other members of the

Plaintiffs' faith, if there are any employed by UL, would be negatively affected by the COVID policy.[4]  *See Niemeyer v. NW Permanente,* 2024 WL 4693894, at *6 (D. Or. Nov. 6, 2024) ("Plaintiff has not alleged that other Christians share her belief[.]"). Similarly, there is nothing in the record that otherwise explains how the fundamental tenets of the Natural Law faith might cause the COVID policy to create a disparity between members of this faith and secular individuals.

Second, Plaintiffs present no evidence of the religious makeup of UL's workforce, and whether any individuals with different belief systems were also negatively impacted by the COVID policy.  *See Kennedy v. PEI-Genesis,* 719 F. Supp. 3d 412, 419 (E.D. Pa. 2024) (the plaintiff was unable to pursue a disparate impact claim without presenting evidence of the religious makeup of the company's workforce).  Because Plaintiffs provide no evidence of a disparate impact, they fail to establish a genuine dispute of material fact.  Accordingly, the Court grants summary judgment in Defendant's favor as to this claim.

## II.    Title VII Failure to Accommodate

### A.    *Prima Facie Case*

To establish a prima face case for a failure to accommodate claim, a plaintiff must show that: "(1) he or she has a bona fide religious belief that conflicts with an

---

[4]    While statistic evidence is not required when "the plaintiff can show that the challenged practice would disproportionately impact all or substantially all members of the protected class," this exception is not applicable here because it is unclear whether all members of the Natural Law faith share Plaintiffs' beliefs. *See Okeke v. Adm'r s of Tulane Educ. Fund*, 2021 WL 2635451, at *7 (E.D. La. June 26, 2021), *aff'd sub nom.  Okeke v. Administrators of Tulane Educ. Fund*, 2022 WL 1025991 (5th Cir. Apr. 6, 2022).

employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Turpen v. Missouri-Kansas-Texas R. Co.*, 736 F.2d 1022, 1026 (5th Cir. 1984). "Bona fide religious beliefs include 'moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.' … Specifically, a court's task is to decide 'whether [the individual's beliefs] are, in his own scheme of things, religious.' … In this regard, a belief is 'religious' if it is '[a] sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by … God.'" *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485-86 (5th Cir. 2014) (citations omitted).

### B.    Arguments Before the Court

Defendant begins by asserting that Plaintiffs are unable to meet the first element of their prima facie case because "[t]here is no identifiable parameter or limitation to what Plaintiffs seek guidance from God for, and what God provides guidance to them about." [Doc. 70-1, p. 13]. *See also* [Doc. 74, p. 4]. Regardless, even if the Court were to find that Plaintiffs can establish a prima facie case, Defendant argues that Plaintiffs' suggested accommodations would cause undue hardship to the university, both financially and in causing it to violate its public health and safety obligations. [Doc. 70-1, pp. 14-20]; [Doc. 74, pp. 5-7].

In opposition, Plaintiffs first claim that they "adhere to established religious doctrine[s]." [Doc. 73-1, p. 14]. Turning to the reasonableness of their requested accommodations, Plaintiffs assert that: (i) their work histories demonstrate that

flexible work does not pose issues for UL; (ii) the other exceptions to weekly testing show that Defendant had the "ability to manage individualized testing exceptions without substantial disruption;" and (iii) Defendant misrepresented Mrs. Meullion's role when they stated she provided clerical support to "the assistant director of the department."[5]  *Id.* at pp. 16-18.

### C.    *Prima Facie Analysis*

First, Plaintiffs have presented sufficient evidence that they hold a bona fide religious belief that conflicted with the COVID policy.  Plaintiffs testified in their depositions that the Natural Law faith is a belief system that requires prayer to obtain guidance from God and follows the Ten Commandments.  [Doc. 70-2, pp. 25-27].  According to Plaintiffs, the most significant commandment of Natural Law faith adherents is "Thou shalt have no other Gods before me," which Plaintiffs believe requires strict observance to the guidance God gives individually to the faithful.  [Doc. 73-2, pp. 307-08].  Plaintiffs attest that this includes "immunizations, testing, or other medical interventions that are not accepted through prayer and God['s] guidance." *Id.* at p. 308.   Both Plaintiffs testified that upon prayer and consultation, God informed them not to take the COVID vaccine or undergo any testing.  [Doc. 70-2, p. 28]; [Doc. 70-3, pp. 21-22].  And there is no evidence that their beliefs are secular or medical rather than religious.  The law in the Fifth Circuit is clear that "judicial inquiry into the sincerity of a person's religious belief 'must be handled with a light

---

[5]     Plaintiffs argue that this overstates Mrs. Meullion's role because she only provided clerical support to the assistant director of the Ronald E. McNair program.  [Doc. 73-2, p. 3].

touch or judicial shyness.'"  *Davis*, 765 F. 3d at 486.  The evidence Plaintiffs submit

is therefore sufficient to create a factual issue that must be decided by the jury.[6]

Second, Plaintiffs informed Defendant of their beliefs that conflicted with the

COVID policy.  On October 7, 2021, Plaintiffs separately sent Notice of Rights

Violations emails to UL's Human Resources Department, in which they stated that

they held specific religious beliefs that precluded them from complying with the

COVID policy, specifying that "any medical treatments and/or medical procedures

that are not accepted through prayer and guidance from GOD are in violation of

[their] sincerely held religious convictions."[7]  [Doc. 73-2, pp. 84, 189].  While there is

little evidence in the record that either substantiates or contradicts the existence of

an actual conflict between the teachings and beliefs of the Natural Law faith and

UL's COVID policy, the Court finds that Plaintiffs' Notice of Rights Violations emails

contain language sufficient to inform Defendant of their personal religious beliefs.

Finally, the summary judgment evidence substantiates that Plaintiffs'

termination was motivated – at least in part – by their objection to and failure to

---

[6]     *See Bellard v. Univ. of Texas MD Anderson Cancer Ctr.,* 716 F. Supp. 3d 503, 513-14 (S.D. Tex. 2024) (citations omitted) ("All three make clear that their principal rationale in refusing the vaccine was to follow God's will. These viewpoints are quintessentially religious.").  *See also Troutman v. Teva Pharms. USA, Inc.,* 2024 WL 3635303, at *6-7 (E.D. Tex. June 25, 2024) (citations omitted) (finding a bona fide religious belief where the plaintiff referred to specific scripture, explained how a vaccination would go against that scripture, and explained that his opposition was "based on prayer[.]").

[7]     In Plaintiffs' religious accommodation form they stated "Please see the religious notification letter that was submitted and emailed on October 7, 2021, to the human resources consultancy email.  For your convenience, I've included the email and letter."  [Doc. 73-2, pp. 159, 258].  The text referred to above is from the October 7, 2021.

comply with Defendant's COVID policy.[8]   Plaintiffs have therefore established a prima facie claim of failure to accommodate.

### D.    Undue Hardship

"With a prima facie case established, the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship." *Davis,* 765 F.3d at 485-86.  The Supreme Court recently clarified the standard for hardship in *Groff v. DeJoy*, 600 U.S. 447, 143 S. Ct. 2279, 216 L.Ed.2d 1041 (2023), holding that an employer must demonstrate "a burden substantial in the overall context of [its] business, which involves a fact specific inquiry."   As such, a court must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of an employer."   *Id*.  Moreover, an employer must demonstrate that "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."   *Id*. However, "[i]f a requested accommodation poses an undue hardship, the employer must *sua sponte* consider other possible accommodations pursuant to Title VII's prohibition against religious discrimination; only after thorough consideration of other options may the employer deny the employee's request for accommodation." *Hebrew v. Texas Dep't of Crim. Just*., 80 F.4th 717 (5th Cir. 2023).

---

[8]     For instance, prior to termination, Plaintiffs received the following email: "On 11.16.21, you were notified that you were not compliant with the testing program requirements and would have 24 hours to become compliant.  You were informed that if you failed to comply you would not be permitted to report to work and would be subject to unpaid leave and disciplinary action up to and including termination of employment."  [Doc. 73-2, pp. 150, 249].

Based on the summary judgment evidence in the record, Defendant has met its burden to show that allowing Plaintiffs to telework would cause undue hardship. First, the summary judgment evidence in the record establishes that Plaintiffs' job duties are not suited to remote work. Had Defendant allowed Plaintiffs to work remotely, it would have had to hire additional employees for duplicative work. Specifically, Meullion provided clerical support to the assistant director of the Ronald E. McNair program and provided services to students in the program. [Doc. 70-3, p. 10]. As part of her job, students would come to her office to get research supplies and meet with her if they required assistance. *Id*. at pp. 10-12. In her clerical role, she maintained physical files, managed student workers in her office, and carried out tasks given to her by the assistant director, such as delivering things to other individuals on campus. *Id*. at pp. 10, 12-13, 30. Underwood provided technological and data analyst support to the Department of Special Services and maintained the student computer lab and on-site servers. [Doc. 70-2, pp. 9, 13]. While Underwood was able to remotely access computers to provide assistance, he conceded that he would occasionally have to go into the office to physically work on computers. *Id*. at pp. 13, 41.

As demonstrated by this evidence, the nature of Plaintiffs' jobs required a physical presence in the office. *See DeVore v. Univ. of Kentucky Bd. of Trustees*, 693 F. Supp. 3d 757, 765 (E.D. Ky. 2023), *aff'd*, 118 F.4th 839 (6th Cir. 2024) (finding fully remote work posed undue hardship where an employee managed the daily clerical tasks of the office, interfaced with students and other employees, and interacted daily

with staff and students). And the length and amount of the cost accrual associated with Plaintiffs' requested accommodations – including the hiring of additional personnel to fulfill the on-site requirements of both jobs – was unknown and open-ended given the uncertainty surrounding the COVID pandemic. *Contra Groff,* 600 U.S. at 471 ("[N]o undue hardship is imposed by temporary costs.").

Furthermore, there is evidence that telework can lead to a decrease in productivity. Benhamin Laker, *Working From Home Leads to Decreased Productivity, Research Suggests*, FORBES (Aug. 2, 2023), https://www.forbes.com/sites/benjaminlaker/2023/08/02/working-from-home-leads-to-decreased-productivity-research-suggests/. As a result of this loss in productivity, Defendant may have experienced additional financial hardship.

But that is not the end of the Court's inquiry. Rather, if a requested accommodation poses an undue hardship, an employer is charged with a *sua sponte* duty to consider other possible accommodations. *Hebrew,* 80 F.4th at 722, *citing Groff,* 600 U.S. at 473. Only after thorough consideration of other options may the employer deny the employee's request for accommodation. Here, although the Plaintiffs suggested several possible accommodations in their accommodation requests, Defendant admits it did not consider other alternative accommodations. [Doc. 73-2, pp. 159, 166, 258, 264].[9]

---

[9]    In their religious accommodation request, Plaintiffs listed the following accommodations: wearing a mask/face shield, social distancing, disinfecting their workspaces, teleworking, alternating schedules, plexiglass barriers, and completing the daily COVID self-checks. *Id.*

Moreover, an independent review of the record supports that a jury might very well find that Plaintiffs' alternative accommodations would not have resulted in an undue hardship to UL. There is no evidence in the record that any of the requested alternative accommodations would have resulted in any financial impact on the university. Nor does the summary judgment evidence support an inference that the alternative accommodations would have imposed an undue burden on the university due to health and safety concerns.

Specifically with respect to UL's stated health and safety concerns, Defendant fails to articulate in its briefing the precise interest it sought to protect with its COVID policy. While it is clear that UL publicly stated its intent in implementing the COVID policy was to decrease the transmission of COVID, other evidence in the record undermines this rationale.[10] In its supplemental brief, Defendant produced CDC guidelines from July 23, 2021, and EEOC guidance from 2020, that it claims it relied on to protect health and safety at the time it implemented the policy. But this guidance only bolsters Plaintiffs' argument about the importance of offering other accommodations – such as telework, modified job responsibilities, and masking, among other measures – and the effectiveness of those other accommodations to promote health and safety and inhibit transmission of the virus. [Doc. 89-1, pp. 8, 13,

---

[10]     [Doc. 73-2, p. 249] ("The University initiated the process of weekly mandatory COVID[] screening testing for all faculty, staff, and student employees to further ensure the safety of our employees[.]"); *Id.* at p. 299 ("Testing will allow the University to proactively detect infection and prevent further transmission of the virus. … The University's decision to test employees and students working on campus will help to mitigate the spread of the virus[.]").

39].[11]  And, just as importantly, there is evidence in the record that as of July 20, 2021, the vaccine was known <u>not</u> to prevent transmission of COVID,[12] a fact acknowledged by the President and CEO of the UL System in a letter dated August 2, 2021, approximately six weeks before the university's COVID policy was put into effect.[13]  Thus, the COVID policy's exemption of vaccinated employees from the weekly testing requirement runs counter to UL's stated goal of preventing transmission.  Given that the COVID policy's onerous testing requirement applied only to non-vaccinated employees, it seems more likely that the policy was implemented to strongly encourage employees to get vaccinated.

Thus, the Court denies summary judgment on Plaintiffs' failure to accommodate claim under Title VII because: (i) UL failed to consider alternative accommodations, and (ii) had the university considered CDC-approved alternative

---

[11]     "Key prevention strategies [that reduce the spread of COVID] include offering and promoting vaccination, consistent and correct use of masks, physical distancing, handwashing and respiratory etiquette." *Id*. at p. 8.  "Administrators can help to protect people at increased risk for severe COVID[] and promote health equity by implementing the following strategies … Offer accommodations, modifications, and assistance to students, faculty and staff at increased risk for severe illness that limit their exposure risk and allow for education and or work opportunities (such as virtual learning, telework, and modified job responsibilities) remain available to them." *Id*. at p. 13.  "Accommodations … may include additional or enhanced protective gowns, masks, gloves, or other gear beyond what the employer may generally provide to employees returning to its workplace." *Id*. at p. 39.

[12]     [Doc. 73-2, p. 305] ("Statement from CDC Director Rochelle P. Walensky … July 20, 2021 … High viral loads suggest an increased risk of transmission and raised concerns that, unlike with other variants, vaccinated people infected with Delta can transmit the virus. … The masking recommendation was updated to ensure the vaccinated public would not unknowingly transmit the virus to others[.]").

[13]     [Doc. 73-2, p. 324] ("August 2, 2021 … [D]ata indicates the vaccinated who are infected may transmit the virus at similar levels to unvaccinated.  This is further support for universal masking in our facilities.").

accommodations for Plaintiffs to meet its stated public health goals, such accommodations likely would not have resulted in undue hardship.[14]

## III.   Title VII Retaliation

### A.   *Prima Facie Case*

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (i) he engaged in protected activity; (ii) his employer took an adverse employment action against him; and (iii) there is a causal link between the protected activity and the adverse employment action.  *Baker v. Am. Airlines, Inc.*, 430 F.3d 750, 754 (5th Cir. 2005).  Protected activity is "opposition to any practice rendered unlawful by Title VII including making a charge, testifying, assisting, or participating in any investigation proceeding or hearing under Title VII."  *Patrick v. Walmart, Inc.,* 2020 WL 908443 at *10 (La. W.D. Feb. 24, 2020), *quoting Ackel v. Nat'l Commc'ns.*, 339 F.3d 376, 385 (5th Cir. 2003).

### B.   *Arguments Before the Court*

In the Motion, Defendant argues that Plaintiffs cannot prove causation because "the evidence shows that Plaintiffs were terminated for failure to follow" the COVID policy.  [Doc. 70-1, p. 21].  Plaintiffs respond that the protected activity in this matter was the sending of Notice of Rights Violations emails to Defendant.  [Doc. 73-1, p. 7].  Plaintiffs argue that "the sequence of events demonstrates a clear causal

---

[14]   "As reasonable minds may differ as to the specific impact of each plaintiff's requested accommodation, this question poses a genuine issue of material fact."  *Bellard v. Univ. of Texas MD Anderson Cancer Ctr.,* 716 F. Supp. 3d 503, 516 (S.D. Tex. 2024), *appeal dismissed sub nom. Bellard v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 2024 WL 5459155 (5th Cir. July 25, 2024), *citing Equal Emp't Opportunity Comm'n v. Universal Mfg. Corp.*, 914 F.2d 71, 74 (5th Cir. 1990).

connection between Plaintiffs' protected activities and the adverse employment actions they suffered." *Id.* at p. 9. And they contend that Defendant's pretextual motivation for their termination is evidenced by both: (i) text messages among Defendant's employees and (ii) Defendant's failure to engage in good faith efforts to accommodate Plaintiffs. *Id.* at pp. 10-12.

### C.    *Prima Facie Analysis*

Here, Plaintiffs present sufficient evidence to establish a prima facie case of retaliation under Title VII. First, they engaged in a protected activity when they provided Defendant with Notice of Rights Violations emails in response to the COVID policy, citing religious objections and asserting that their Title VII rights were violated.[15] Both Plaintiffs sent Notice of Rights Violations emails on October 14, 2021, and again on November 5, 2021. [Doc. 73-2, pp. 91, 129, 196, 228]. Plaintiffs also demonstrate that they had difficulty obtaining religious accommodation forms from Defendant.[16] Second, it is undisputed that Defendant took adverse action against Plaintiffs when they were terminated. *Id.* at pp. 172-73, 270. Lastly, the temporal proximity between the protected activity and Plaintiffs' termination establishes the required causal link. Plaintiffs engaged in protected activities on October 14, 2021, and November 5, 2021, and were terminated on November 22, 2021. This length of time is sufficient to establish causation based on timing alone for a

---

[15]    The Court notes that merely requesting a religious accommodation may also constitute a protected activity. *See Sambrano v. United Airlines, Inc.,* 707 F. Supp. 3d 652 (N.D. Tex. 2023), *reconsideration denied,* 347 F.R.D. 155 (N.D. Tex. 2024).

[16]    *See* n.17 *infra.*

prima facie case. *Ellis v. Schneider Nat'l, Inc.*, 2023 WL 7204481, at *8 (S.D. Tex. Sept. 26, 2023), *aff'd sub nom. Ellis v. Schneider Nat'l Carriers, Inc.,* 2024 WL 1693875 (5th Cir. Apr. 19, 2024) (the Fifth Circuit has found causation based on timing alone for periods up to two-and-a-half months).  As such, Plaintiffs have successfully established a prima facie case of retaliation.

### D.    *Employer's Legitimate Non-Discriminatory Reason*

When a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).  Defendant asserts that Plaintiffs were terminated for failing to adhere to the COVID policy, and the record provides corroborating evidence.  Plaintiffs received several communications indicating that non-compliance with the COVID policy would result in discipline, including unpaid leave and termination.  [Doc. 73-2, pp. 88-89, 95-96, 98, 105-07, 193-94, 200-01, 203, 211-13].  Moreover, on November 15, 2021, Plaintiffs were informed that if they did not comply with the COVID policy within twenty-four hours they would be placed on unpaid leave.  *Id.* at pp. 147, 246. Jurisprudence within the Fifth Circuit establishes that failure to obey a direct order from one's superiors satisfies this prong of *McDonald Douglas*.  *See Horvath v. City of Leander*, 946 F.3d 787, 793 (5th Cir. 2020), *as revised* (Jan. 13, 2020); *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007).  Considering this, the Court finds that failure to comply with the COVID policy is a legitimate, non-discriminatory reason for terminating Plaintiffs.

### E.    Pretext

Given Defendant's alleged non-discriminatory reason for its adverse employment actions, Plaintiffs are charged with producing evidence that may prove Defendant's non-discriminatory justification is pretextual. *Saketkoo v. Administrators of Tulane Educ. Fund,* 31 F.4th 990, 1001-02 (5th Cir. 2022) (internal quotations omitted). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Troutman v. Teva Pharms. USA, Inc.*, 2024 WL 3635303, at *11 (E.D. Tex. June 25, 2024). The Fifth Circuit has "recognized that a plaintiff can show pretext through temporal proximity plus significant record evidence." *Shahrashoob v. Texas A&M Univ.*, 125 F.4th 641, 653–54 (5th Cir. 2025).

Here, Plaintiffs present sufficient evidence that Defendant's non-discriminatory justification is pretextual to create a genuine dispute of fact. To start, the temporal proximity between Plaintiffs' protected activity and subsequent termination serves as evidence of pretext. Next, the text messages between Defendant's employees cast doubt on Defendant's proffered reason for termination. Notably, these text messages include statements such as "this has a lawsuit with my name on it" and "[n]o, I am confident in our responses, especially to these two who have just been trying to play games with us." [Doc. 73-2, pp. 285-86]. Further, the document denying Plaintiffs' accommodations indicates that no accommodations were ever considered. [Doc. 73-2, pp. 166, 264]. Lastly, there is evidence in the record

that suggests that Plaintiffs had difficulty obtaining religious accommodation forms from Defendant.[17]

Defendant's attempt to controvert this evidence in its supplemental brief [Doc. 89] is unsuccessful. Defendant submits the testimony of a member of its Human Resources Department, Lelanya G. Douet, in which she provides a list of employees who: (i) received noncompliance notices, (ii) were placed on leave, and (iii) were "separated" from their employment with UL. *Id.* at p. 2. But this evidence falls short on several fronts. Specifically, this affidavit fails to: (i) explain why some employees placed on leave were not subsequently terminated like Plaintiffs, (ii) specify whether certain employees who are no longer employed by Defendant were terminated or quit, and (iii) contains no information as to why the listed employees failed to comply with the COVID policy. Conversely, because the affidavit reveals that only a small number of the employees that failed to abide by the COVID policy were "separated," this testimony may be viewed by the jury as providing additional evidence of pretext. Because there remain genuine disputes of material fact as to pretext, summary judgment on Plaintiffs' claims of retaliation under Title VII is denied.

---

[17]     Plaintiffs first notified Defendant of a religious conflict on October 7, 2021. [Doc. 73-2, pp. 84, 189]. Defendant then informed Plaintiffs that no accommodation could be requested. *Id.* at pp. 86, 191. On October 14, 2021, Plaintiffs sent Notice of Rights Violations emails. *Id.* at pp. 91, 196. On October 21, 2021, Plaintiffs received emails with hyperlinks to online accommodation forms. *Id.* at pp. 100, 205. Plaintiffs allege they had difficulties filling out the online version of the form. *Id.* at pp. 6, 182. As such, Plaintiffs requested a physical or PDF version of the form on October 27, 2021. *Id.* at pp. 115, 221. On October 28, 2021, Plaintiffs received an email that stated the form could only be completed electronically. *Id.* at pp. 118, 223. On November 5, 2021, Plaintiffs sent their second opposition letters. *Id.* at pp. 129, 228. Subsequently, on November 8, 2021, Plaintiffs were provided with a PDF version of the accommodation form to fill out. *Id.* at pp. 137, 236.

IV.    **Title VII Disparate Treatment**

A.    *Prima Facie Case*

To prove a prima facie case of disparate treatment, a plaintiff must satisfy the following elements: "(1) membership in a protected class, (2) that he was qualified for the position, (3) that he was subject to an adverse employment action, and (4) that he was treated less favorably than was a similarly situated employee outside the protected class." *Toronka v. Cont'l Airlines, Inc.,* 411 F. App'x 719, 723 (5th Cir. 2011). Employees are considered similarly situated when they have "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories." *Garcia v. Pro. Contract Services, Inc.*, 938 F.3d 236, 244 (5th Cir. 2019), *quoting Lee v. Ks. City Rwy. Co.*, 574 F.3d 253, 259-60 (5th Cir. 2009). Once similarly situated employees are identified, the Plaintiff must also show that the alleged conduct leading to his adverse-employment decision is "nearly identical" to the comparable history of similarly situated employees who did not receive the same treatment. *Id.*

B.    *Arguments Before the Court*

Defendant argues that Plaintiffs cannot prove disparate treatment because they indicated in their depositions that they were unsure exactly why they were terminated. [Doc. 70-1, p. 22]. In response, Plaintiffs first assert that they are members of a protected class and were qualified for their positions. [Doc. 73-1, p. 21]. Plaintiffs also contend that similarly situated employees outside of the protected class

were treated more favorably because employees who were vaccinated or tested positive for COVID within ninety days did not have to undergo weekly testing. *Id.*

### C.    *Prima Facie Analysis*

It is uncontroverted that Plaintiffs are members of a protected class, that they were qualified for their positions, and that they were subject to an adverse employment action when they were terminated. The focus of the Court's inquiry, then, is on the fourth element, i.e., whether Plaintiffs can demonstrate that there is a genuine dispute of material fact as to whether they were treated less favorably than similarly situated employees. Here, Plaintiffs fail to identify a valid comparator with different religious affiliations who shared their job title, duties, or supervisor. Because "[c]onclusory allegations regarding an employer's treatment of other unidentified employees are insufficient to plead a circumstantial link between an adverse employment action and membership in a protected class," the Court dismisses Plaintiffs' Title VII disparate treatment claim with prejudice.[18] *Reichert v. Infusion Partners, L.L.C.,* 2023 WL 4685377, at *6 (E.D. La. July 21, 2023).

---

[18]    *See Niemeyer,* 2024 WL 4693894, at *5 (no prima facie case when the plaintiff presented no evidence of other nonvaccinated employees who were permitted to continue working; claim requires a plaintiff to "allege that she was treated differently from employees in the same position as [the] [p]laintiff who declined to comply with the vaccination requirement based on secular grounds or different religious beliefs, not that she was treated differently than employees who sought no exemption.").

## V.    Title VII Hostile Work Environment

### A.    *Governing Law*

"A plaintiff may not base a Title VII claim on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not reasonably be expected to grow out of the charge of discrimination." *Culver v. Factory Mut. Ins. Co.*, 2024 WL 4500736, at *4 (E.D. Tex. May 30, 2024*), report and recommendation adopted,* 2024 WL 4299026 (E.D. Tex. Sept. 26, 2024) (internal quotations omitted).  "For a claim of hostile work environment to reasonably be expected to grow out of an employee's charge of discrimination, the employee must allege more than just discrete acts of discrimination."  *Gates v. Lyondell Petrochemical Co.*, 227 F. App'x 409 (5th Cir. 2007).

"To establish a claim of hostile work environment, a plaintiff must prove he: (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action."  *Johnson v. PRIDE Indus., Inc.,* 7 F.4th 392, 399-400 (5th Cir. 2021).  "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### B.    Arguments Before the Court

Defendant contends that Plaintiffs failed to exhaust this claim because they never filed a charge of harassment or hostile work environment with the EEOC. [Doc. 70-1, pp. 22-23]. In response, Plaintiffs argue that this claim arises from the same facts described in the EEOC charge and is reasonably related to allegations of retaliation. [Doc. 73-1, pp. 18-19].

### C.    Analysis

Here, Plaintiffs' hostile work environment claim could not "reasonably be expected to grow out of the charge of discrimination." *Culver,* 2024 WL 4500736. Plaintiffs only lodge complaints based on the denial of an accommodation, which they allege to be a result of religious discrimination and retaliation.[19] There is no discussion of acts sufficiently severe or pervasive to qualify as harassment under Title VII. *See Gates v. Lyondell Petrochemical Co.*, 277 F. App'x 499 (5th Cir. 2007) ("[The

---

[19]    Meullion's EEOC complaint states that she is alleging discrimination based on "Retaliation, Religion," and continues:

> I began my employment with the above Respondent in May 2004. My previous position was a Program Assistant. On September 28, 2021, I was notified by my employer that it would be implementing a weekly mandatory COVID-19 screening for employees. On October 6, 2021,I was notified that if I did not provide a COVID-19 vaccination record by October 7, 2021,I would be placed in a pool and required to test for COVID-19 weekly. I sincerely hold a religious belief that conflicts with my employers Covid testing requirement. During my employment, I notified my employer of my religious belief, and I requested an accommodation to be exempt from Respondents Covid testing mandate, which was denied. On November 18, 2021, I was placed on leave without pay and on November 22, 2021, I was discharged via letter from Chief of H.R. Paul Thomas. I believe that I have been discriminated against because of my religion (Natural Law) and retaliated against in violation of Title VII of the Civil Rights Act of 1964 as amended.

[Doc 73-2, pp. 175]. Mr. Underwood's EEOC charge is nearly identical. *See id.* at p. 272.

plaintiff's] hostile environment and unequal pay claims could not be expected to grow out of her EEOC discrimination charge when she charged only her employer's discrete acts in terminating and failing to promote her and made no mention of a hostile work environment or unequal pay.").  Accordingly, summary judgment is warranted as to Plaintiffs' hostile work environment claims.

**CONCLUSION**

For the foregoing reasons, the Court finds that there are genuine disputes of material fact that preclude summary judgment as a matter of law for Plaintiffs' retaliation and failure to accommodate claims under Title VII.  Fed. R. Civ. P. 56.

Accordingly,

IT IS HEREBY ORDERED that Defendant's MOTION FOR SUMMARY JUDGMENT [Doc. 70] is DENIED as to Plaintiffs' claims for retaliation and failure to accommodate under Title VII.

IT IS FURTHER ORDERED that the remainder of Plaintiffs' claims against Defendant are DISMISSED WITH PREJUDICE.

THUS, DONE AND SIGNED in Chambers on this 28th day of March 2025.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE